In the Matter of the Application of THE CITY OF NEW YORK, Relative to Acquiring Title, etc., for the Opening and Extending of Saratoga Avenue, etc.

THE CITY OF NEW YORK, Appellant; THE NASSAU ELECTRIC RAILROAD COMPANY, Respondent.

Second Department, December 14, 1917.

Eminent domain — designation of land to city of New York for street purposes — effect of subsequent acquisition of same land by railroad company upon right of city to acquire same for street purposes.

Where the State under chapter 670 of the Laws of 1869 has designated and impressed a public use on land for highway purposes to a town and its successor, the city of New York, and has caused said land to be mapped, and a railroad company has subsequently acquired such land for terminal

purposes, the city may, nevertheless, proceed to acquire title to the land, making due compensation to the railroad company as it would to any private owner, but if the railroad company is using the land for a public purpose consistent with the paramount right of the city to use it for street purposes, the right of the railroad company may be preserved in subordination to that of the city.

APPEAL by the City of New York from an order of the Supreme Court, made at the Kings County Special Term and entered in the office of the clerk of the county of Kings on the 9th day of July, 1914, confirming the report of a referee.

*Andrew C. Troy* [*Lamar Hardy, Corporation Counsel,* and *Howard L. Campion* with him on the brief], for the appellant.

*Charles L. Woody* [*George D. Yeomans* with him on the brief], for the respondent.

THOMAS, J.:

The city would open Chester and Bristol streets running northerly and southerly, in the borough of Brooklyn, and formerly in the town of Flatlands. The respondent, Nassau Electric Railroad Company, owns land through which they pass, and uses it among other things for storing cars. Can the city condemn it? The railroad company denies the power upon the plea that it has already appropriated the land for a public purpose and that it cannot be again taken without appropriate legislative authority. The railroad company is not chartered to operate a railway over it, but asserts its necessity for the terminal purposes of its authorized lines. The land in question is that within Chester and Bristol streets and land abutting thereon. Some of the abutting land is used for a depot for cars and the remainder for tracks for approaching the depot and for storing cars. The company acquired a part of the land in 1896 and the remainder in 1907. In 1874 the land in Chester and Bristol streets had already been designated for another public use, which prevents the railroad company from using it for its railroad purposes. The deed by which the railroad company acquired the first parcel in 1896, abutting on Chester street, has this: "Together with the right, title and interest of the parties of the first part in and to the land in Rockaway Avenue and

Second Department, December, 1917.        [Vol. 180.

Chester Street and the New Lots Road to the centres thereof in front of said premises. Said Avenues and Street being as the same are laid down on the Map of the Town Survey Commission of Kings County but said Chester Street and Vienna Avenue are neither of them to be deemed dedicated hereby being used for the purpose of description only. It is Further Consented that when Chester Street is legally opened the railroad company may place a double track in the center of the street but said track is not to be used for storing or as a stand for cars." The deed by which the railroad company acquired the second parcel in the description refers to Chester and Bristol streets, and has this: "Together with all the right, title and interest of the parties of the first part of, in and to Chester Street, Old New Lots Road, Road leading from Canarsie to Flatlands and Road to Vanderveer's Mill lying in front of and adjoining said premises to the centre lines thereof respectively." The map to which the deed of 1896 refers is a general map or plan of the towns of New Utrecht, Flatbush, Gravesend, Flatlands and New Lots, in the county of Kings, prepared by the town survey commissioners pursuant to acts of the Legislature (Laws of 1869, chap. 670, amd. by Laws of 1872, chap. 331. See, also, Laws of 1874, chap. 581), and filed in the office of the register of the county of Kings in the year 1874. The map was made by the direction of the State, and when Chester and Bristol streets were laid down on the map and the map filed, there was a completed exercise of the sovereign power authorizing their appropriation for roads and streets in the county of Kings, that is, for a particular public purpose. So, before the purchase of any of the land for railroad purposes, the State had proclaimed its will for the appropriation of the land to public purposes through the agency of the commission provided in the act of 1869. Such commission acting for the State had designated the spaces called Bristol and Chester streets as streets to be taken for the purposes of highways in towns. That could not affect the property interest of the owner, (*Matter of City of New York* [*Avenue D*], 200 N. Y. 536.) Whether the land should be owned by Leinfelder, Ryan or the railroad company, the property with all the qualities that pertain to ownership was in the holder of the title. But

such ownership did not involve the right to appropriate the property to a public use.  The owner could sell to any person for a public use, but the grantee could not so use it, unless the State had given and continued to such grantee the capacity so to, do.  In the present instance the State had, earlier than 1896, conferred the power on the town of Flatlands in the county of Kings by directing public officers to map streets that the town might appropriate for public purposes.  That was not acquisition of title; the act and the actors under it could not diminish the beneficial uses of the owners; no owner's power to alienate an individual interest was impaired.  But the State thereby appointed the town of Flatlands as the only public body that could use the land for public purposes, and pending a withdrawal or modification of that privilege, no other agent of the State could intervene and take for its peculiar use what the State had ascribed to another.  And yet that is what the railroad company would do.  What the Legislature determined, it would supplant. The right to use certain land for indicated public purposes the railroad company would divert to itself. · Chapter 670 of the Laws of 1869 was the expression of the policy of the State concerning the public highways of certain of its territory.  Except as special acts did or should otherwise provide, the act of 1869 provided an exclusive and comprehensive method of laying out streets, and when the commissioners laid out the streets under the act the statute declared " no street or avenue shall be laid out in said towns,    *    *    * except in accordance with said plan so adopted, and all streets or avenues afterwards opened, widened or improved, shall be made to conform to such permanent plan and the lines thereof." So the act and the doing of the commissioners pursuant to it, in the absence of special acts, underlay all street openings in the towns and their coterminus relation to streets in the city of Brooklyn.  And yet, when the town of Flatlands, or its successor, the city of New York, looks for its power to open a street for public purposes it is met by the railroad company asserting that it, as a public service corporation authorized to acquire land for public purposes, albeit only through endowment by the State, may take for its purposes  ·

land that the State, its source of power, has designated for other public uses. Thus by thrusting itself between the designation by the State of Chester and Bristol streets to street purposes, and the acquisition of the title thereof by the city, the railroad company would thwart the broad and settled scheme of the State. The creating power segregated a parcel of its domain for public roads, and thereupon its creature and agent would set it apart for railroad purposes. This is not at all a question of depriving the owner of any interest in his property. All that he has the city may take only upon paying for it. It is a question of the priority of public capacities, not to buy property, but to apply it to a public use. If the railroad company is approved in its contention, any railroad company, needing land for corporation purposes, may blot out portions of the map of the city of New York, if the city has not already taken proceedings to acquire title. The city obtains no interest by the map filed, but all other public bodies are excluded from taking the property for public purposes. That is a function of the State, and all divisions of the State and agents of the State can exercise that function only in subordination to the will of the State. Whoever owns may sell to whoever will buy, but none save the town or its successor city can use for public purposes. It is not a quality of ownership that the owner's vendee may use the land for a public purpose. It is said in *Matter of Hamilton Street* (144 App. Div. 702), "no public right or interest in the lands to be covered by the proposed streets did in fact arise from the mere laying out of the street on the official map, as such in itself was not an appropriation of the land to a public use." In the sense the words were used, it is not an appropriation of the land to public use; but it is a declaration that only the municipality can use the land for a public purpose, and that all the agencies of the State must forbear such use. The State distributes to those who act for it, powers and fields for their exercise. To all may be given the right to use intrastate territory, but there are limitations, as when the State in the important sphere of travel allots a portion of its domain to one of its political divisions. There is no restraint on the owner's use or alienation, but there is a restraint placed upon the right of all other

public bodies to use the locality for any other purpose. The State is and has been holding out this right concerning this land to the town of Flatlands and its successor, and while waiting for its acceptance and the acquisition of the land, the railroad company would turn aside the proffer. The arm the railroad company stretches out is that of the State, and it is trying to impress a public use on land upon which the State for a different purpose already has impressed a public use. Surely it is for the State to determine which of its agencies shall have the duty and the power that support it. How could it be more definite than is shown by the statutes under consideration? This leads to the conclusion that the city may proceed to acquire title to the land, making due compensation to the railroad company, as it would to any private owner, but if the railroad company is using the land for a public purpose consistent with the paramount right of the city to use it for street purposes, the right of the railroad company may be preserved in subordination to that of the city.

The order should be reversed, with ten dollars costs and disbursements.

JENKS, P. J., STAPLETON, MILLS and RICH, JJ., concurred.

Order reversed, with ten dollars costs and disbursements.